**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**


**MEREDITH COLLINS,**

      **Plaintiff,**

**v.**                                                                   **Civil No.: 2:06cv342**

**LANDMARK MILITARY**
**NEWSPAPERS, INC.,**

      **Defendant.**


<u>**OPINION and ORDER**</u>

The matter before the Court is an employment discrimination dispute brought under the

Equal Pay Act of 1963 ("Equal Pay Act") and Title VII of the Civil Rights Act of 1964 ("Title

VII") against Landmark Military Newspapers, Inc. ("Landmark" or "Defendant") by Meredith

Collins ("Collins" or "Plaintiff"), a former employee of Landmark.  Three motions are currently

before the Court.  For the reasons that follow, Defendant's Motion for Summary Judgment is

**GRANTED** in part, and **DENIED** in part.  Accordingly, Defendant's Motion for Summary

Judgment is **GRANTED** as to Plaintiff's Title VII claim.  Additionally, Plaintiff's Motion for an

Extension of Time to File its Response to the Summary Judgment Motion, and Motion for Leave

to File an Amended Complaint are **GRANTED** for the reasons stated herein.

I. Procedural History[1]

On June 20, 2006, Plaintiff filed a Complaint against Landmark alleging "gender discrimination and unequal pay in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq. and the Equal Pay Act of 1963, 29 U.S.C. § 206(d)."  Doc. 1 at 1. Defendant filed its Answer on October 23, 2006, denying Plaintiff's allegations of wrongdoing.  Doc. 2.

On April 20, 2007, Defendant filed its Rule 56 Motion for Summary Judgment, and supporting Memorandum.  Docs. 9 (Motion), 10 (Memorandum), 12 (Affidavit filed April 30, 2007 to be included with Memorandum).

On May 1, 2007, Plaintiff filed its Motion for Enlargement of Time to Respond to Defendant's Motion for Summary Judgment, and supporting Memorandum.  Docs. 13 (Motion), 14 (Memorandum).

On May 3, 2007, Plaintiff filed its Memorandum in Opposition to Defendant's Motion for Summary Judgment.  Doc. 15.

On May 7, 2007, Defendant filed its Reply Memorandum in Support of Defendant's Rule 56 Motion for Summary Judgment.  Doc. 16.

On May 9, 2007, Plaintiff filed its Motion for Leave to File First Amended Complaint, and supporting Memorandum.  Docs. 18 (Motion), 19 (Memorandum).

On May 21, 2007, Defendant filed its Memorandum in Opposition to Plaintiff's Motion for Leave to File First Amended Complaint.  Doc. 24.  No reply brief has been filed to this Motion.  See Docket No. 2:06cv342.

---

[1] This section does not necessarily include the entire procedural history of the case, but rather states those events which are relevant to the issue(s) before the Court.

On June 5, 2007, the Court convened a hearing, and heard the arguments of counsel as to these three motions.  See Docket No. 2:06cv342.

## II.  FACTUAL BACKGROUND[2]

### A.  Collins Background and Employment Prior to Landmark

Collins earned a Bachelor's degree in Journalism from University of North Carolina at Chapel Hill.  Doc. 10, Ex. 1 at 17 (Collins Deposition dated February 8, 2007).  After graduation, she was employed in the newspaper business in various capacities for different employers, and recalls earning at most $60,000 to $65,000 prior to going to work for Landmark. Doc. 10, Ex. 1 at 18-33.

### B.  Collins at Landmark

#### 1.  *From Sales Associate to General Manager*

During the spring of 2002, Plaintiff interviewed with Bill Eisenbeiss ("Eisenbeiss") and possibly Beth Johnson ("Johnson"), for Landmark, regarding a sales position with a startup

---

[2] The factual background section does not include all of the facts in this case as presented in the various exhibits filed with the Court, but only those which are relevant to the controversy before the Court.  Additionally, the facts are construed in light of the legal parameters of the summary judgment motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).  Accordingly, where the Plaintiff has presented significantly probative evidence on a disputed factual point, the evidence is considered and presented in her favor. Also,  the Court is concerned only with alleged Equal Pay Act violations which occurred after June 20, 2004, and Title VII claims based on misconduct occurring after June 10, 2004, due to the applicable periods of limitation.  The June 20, 2004 date is two years prior to the filing of the Complaint.  Doc. 1.  This period is not tolled by the EEOC charge, contrary to the argument of Plaintiff.  See Becker v. Gannett Satellite Info. Network, Inc., 10 Fed. Appx. 135, 138 (4th Cir. 2001) (unpublished) (citing C.M. English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987)).  June 10, 2004 is 300 days prior to the filing date of the EEOC charge.  Doc. 16 at 17. Prior history is included, however, to show a full picture of the controversy.

newspaper in Jacksonville, North Carolina.  Doc. 10, Ex. 1 at 30-31; Doc. 10, Ex. 2 at ¶ 5 (Eisenbeiss Affidavit dated April 20, 2007).  Eisenbeiss is and has been the president of Landmark since 2002.  Doc. 10, Ex. 2 at ¶¶ 1-2.  Landmark was created by a parent organization bearing a similar name "to pursue contracts to publish military newspapers at bases around the country."  Doc. 10, Ex. 2 at ¶ 2.  Collins indicated to Landmark that she "had been making around $60,000 in her last job," and was offered that amount for the sales position.  Doc. 10, Ex. 1 at 32; Doc. 10, Ex. 2 at ¶ 6.  Collins accepted the salary as offered to her at $60,000 per year, and began working in May of 2002.  Doc. 10, Ex. 1 at 32; Doc. 15, Ex. 2 at ¶ 1 (Collins unnotarized Declaration dated May 3, 2007); Doc. 15, Ex. 7 (Payroll Authorization effective May 24, 2002).

Shortly after Collins was hired, Landmark needed a temporary start-up publisher at its Jacksonville, North Carolina[3] newspapers.  Doc. 10, Ex. 2 at ¶ 7.  Collins was hired at the same salary of $60,000 per year to fill in until a permanent publisher was hired, and received $7,500 in bonuses for her efforts.  Doc. 10, Ex. 2 at ¶¶ 7-10; Doc. 15, Ex. 8 (Payroll Authorization effective July 1, 2002); Doc. 15, Ex. 2 at ¶ 15.  In May of 2003, Collins' salary was increased to $75,000 at her request.  Doc. 10, Ex. 2 at ¶ 12; Doc. 15, Ex. 11 (Payroll Authorization effective May 25, 2003).[4]  She served in that capacity from June of 2002 until August of 2003.  Doc. 15, Ex. 2 at ¶ 12.  Rick Wilson ("Wilson") was hired as a permanent publisher for the Jacksonville,

_____

[3]  The publisher in Jacksonville, North Carolina, oversees two newspapers, the Globe and the Rotovue.  Doc. 15, Ex. 1 at 169-70 (Eisenbeiss Deposition dated February 9, 2007); Doc. 15, Ex. 2 at ¶ 7.

[4]  Eisenbeiss agreed that Collins' initial salary was set too low for her duties as start-up publisher, and increased her salary accordingly; this occurred in 2003, outside of the limitations period.  Doc. 15, Ex. 1 at 177-78.

North Carolina newspaper, for a salary of $85,000 plus a bonus incentive plan, and started work in August of 2003. Doc. 10, Ex. 2 at ¶ 13. He was hired and compensated accordingly due to his extensive military and newspaper experience. Doc. 10, Ex. 2 at ¶ 13. His experience at that time eclipsed that of Collins, as he had been a publisher, president and general manager for multiple publications spanning several decades and had a military connection that Collins lacked. Doc. 15, Ex. 17 (Collins resume); Doc. 15, Ex. 18 (Wilson resume). Collins was not held responsible for lack of profits at the Jacksonville newspaper during her start-up publisher assignment from July 2002 until August 2003. Doc. 10, Ex. 2 at ¶ 14. The Jacksonville paper lost $430,873 during Collins' tenure. Doc. 10, Ex. 2 at ¶ 14.

Collins was hired as general manager of Landmark after Wilson took over in Jacksonville, and continued at her then salary of $75,000 per year. Doc. 10, Ex. 2 at ¶¶ 15-17. Her new designation as general manager was effective as of August 31, 2003. Doc. 15, Ex. 21 at 2 (Payroll Authorization effective August 31, 2003). Plaintiff reported to Eisenbeiss when she was acting as general manager. Doc. 10, Ex. 1 at 36. Collins was authorized for an increase in salary to $77,625.00 per year in May of 2004, received the increase, and resigned at the end of the year. Doc. 10, Ex. 2 at ¶¶ 32, 36; Doc. 15, Ex. 21 at 1 (Payroll Authorization effective December 31, 2004); Doc. 15, Ex. 2 at ¶ 1. Collins also received bonuses while working for Landmark. Doc. 10, Ex. 1 at 73. Her total bonuses were $7,500 in 2002, and $4,500 in 2004. Doc. 15, Ex. 2 at ¶ 15.

### 2. *General Manager Duties*

In her role as general manager, Collins was "responsible, with Bill Eisenbeiss, for identifying publication targets for acquisition and markets in which to start completely new

publications." Doc. 15, Ex. 2 at ¶ 10. She has described her job as to help Eisenbeiss "build a $50-million business" by "harness[ing] [her] experience and [] capabilities in whatever way was needed." Doc. 10, Ex. 1 at 77; Doc. 10, Ex. 2 at ¶ 18.

Additionally, Collins was solely responsible for "getting the new or acquired publications established, including hiring personnel, starting operations, establishing rapport and first impressions with the military, finding advertisers, establishing processes, serving as publisher and then moving on to acquire or start-up the next publication." Doc. 15, Ex. 2 at ¶ 10. Collins, communicated with the publishers of various Landmark newspapers, looked for new contract opportunities for publications at other military bases, helped publishers with their budgets,[5] reviewed budgets for Eisenbeiss, and assisted with advertising rates and a classified system for the properties. Doc. 10, Ex. 1 at 78, 85; Doc. 10, Ex. 2 at ¶¶ 16-18; Doc. 15, Ex. 2 at ¶¶ 10-11. Collins acted as a start-up publisher for several Landmark newspapers as part of her general manager duties. Doc. 10, Ex. 1 at 53, 57; Doc. 10, Ex. 2 at ¶ 16. A "large component" of her role would include assisting with start-up newspapers. Doc. 10, Ex. 1 at 77; Doc. 10, Ex. 2 at ¶ 16. Even when acting as the start-up publisher, Collins would continue to attend to her numerous other duties as general manager. Doc. 15, Ex. 2 at ¶¶ 11-12.

As general manager, Collins, at her suggestion, performed the duty of major account salesperson. Doc. 10, Ex. 1 at 76. Collins "was also very heavily involved in the day-to-day conversations and operational issues of [the] existing newspapers." Doc. 10, Ex. 1 at 77. However, Eisenbeiss managed the publishers while Collins was general manager. Doc. 10, Ex. 1

---

[5] Collins assisted with publishers' budgets, but did not have authority to approve the budgets. Doc. 10, Ex. 1 at 82-83.

at 82; Doc. 10, Ex. 2 at ¶ 19; Doc. 10, Ex. 3 at ¶ 2 (J.C. Pennington Affidavit dated August 4,

2006); Doc. 10, Ex. 4 at ¶ 6 (Jim Connors Affidavit dated April 20, 2007).  As general manager,

Collins had no community involvement requirements, but was involved in the community only

when substituting as a start-up or temporary publisher.  Doc. 10, Ex. 1 at 83-84.  She did not

make the decision to hire or fire any publisher, but participated in both processes.  Doc. 10, Ex. 1

at 84, 178; Doc. 10, Ex. 2 at ¶ 19; Doc. 10, Ex. 3 at ¶ 4; Doc. 15, Ex. 1 at 116, 119-20.  Collins

was never responsible for the profits or losses of any publication when she was not substituting

as start-up or temporary publisher.  Doc. 10, Ex. 1 at 85; Doc. 10, Ex. 2 at ¶ 19.  She did not

have direct management responsibility of the sales forces at the various Landmark newspapers.

Doc. 10, Ex. 1 at 85; Doc. 10, Ex. 2 at ¶ 19; Doc. 10, Ex. 3 at ¶ 6; Doc. 10, Ex. 4 at ¶ 7.

### 3. *Employment Practices of Landmark*

While at Landmark, Collins never heard Eisenbeiss tell her or anyone else that she was

being paid differently because of gender.  Doc. 10, Ex. 1 at 36.  Others confirm that Eisenbeiss

was not influenced by gender in making employment decisions.  Doc. 10, Ex. 2 at ¶ 39; Doc. 10,

Ex. 4 at ¶ 11; Doc. 10, Ex. 6 at 11 (Pennington Deposition dated April 12, 2007).  Jim Coleman

("Coleman"), Landmark's Human Resources executive, has never encountered a gender

discrimination complaint nor observed any acts of gender discrimination at Landmark.  Doc. 10,

Ex. 5 at 45-48 (James E. Coleman Deposition dated March 22, 2007).  Johnson, another

Landmark employee, believes Collins was treated differently at Landmark but does not know

whether it was due to her gender.  Doc. 10, Ex. 7 at 58-59 (Beth Wendy Johnson Deposition

dated March 22, 2007).  Johnson testified that people are treated disparately at Landmark, but

states she has "seen it happen to females and . . . [has] seen it happen to males as well."  Doc. 15,

Ex. 5 at 34, 58-59 (Beth Wendy Johnson Deposition dated March 22, 2007).  Collins states

another female may have been paid less than men in her position.  Doc. 15, Ex. 4 at 38 (Meredith

Collins Deposition dated February 8, 2007).  In sum, all other employees of Landmark agree that

Eisenbeiss does not discriminate based on gender.  Doc. 10, Ex. 4 at ¶ 11; Doc. 10, Ex. 5 at 46-

47; Doc. 10, Ex. 6 at 40; Doc. 10, Ex. 7 at 58-59.

Collins states her opinion of whether Eisenbeiss intentionally discriminated against her,

concluding in response to questioning:

> Q:    [D]o you believe that Bill Eisenbeiss intentionally discriminated against you
>        because of your gender?
>
> A:    I have never believed that Bill would maliciously, intentionally discriminate
>        against me.  I believe Bill is old school and views women differently than men
>        and viewed me differently from the men, and I don't think it's anything that he
>        purposefully premeditates to do.  I think it's a part of who he is. . . . And I think
>        that's why he couldn't see some of the things that happened were not okay.

Doc. 10, Ex. 1 at 199.  Collins also testified, "I firmly believe that Bill views women differently

than men.  And I think a white male in his 50s automatically gets the respect from Bill that just is

given regardless of any real – any real evidence to warrant that."  Doc. 15, Ex. 4 at 209.

Collins submits that Coleman told her that "Bill [Eisenbeiss] will never treat you fairly" in

conversations with her about salaries.  Doc. 15, Ex. 2 at ¶¶ 19, 37; Doc. 15, Ex. 5 at 31.  There

was no showing in the record that this comment stated a gender bias for the reason of the

predicted unfair treatment.  See Docket No. 2:06cv342.  Collins asserts Eisenbeiss treated her

differently from other male employees by micro-managing her, interrupting her, receiving phone

calls in her presence, asking her to type documents for him, and requiring her to share hotel

rooms with subordinate female employees during business trips.  Doc. 15, Ex. 2 at ¶¶ 38-40.

Collins also states, in her unnotarized declaration dated May 3, 2007, that:

> Mr. Eisenbeiss treated me, in pay and as related above, in a discriminatory manner.  His conduct was intentional.  He views women in starkly different terms than men.  I believe that his attitudes are intrinsic to his nature and "hard-wired."  It is clear to me that Jim Coleman shared his view.

Doc. 15, Ex. 2 at ¶ 43.

### 4.  *Permanent Publisher Position Offered and Collins' Complaints*

At one point Collins states she was never offered a position as a permanent publisher for Landmark, but later agrees that she was offered the position.  Doc. 10, Ex. 1 at 57, 59, 73; Doc. 10, Ex. 2 at ¶ 28.  Collins acknowledges Eisenbeiss told her how much money she could make as a permanent publisher and that she could be a permanent publisher if Landmark won certain future contracts.  Doc. 10, Ex. 1 at 59.  Regarding Eisenbeiss' offer of a permanent publisher position, Collins concluded, "No, I'm the general manager of the division.  Why should I have to take a subordinate job to be paid that way?  Why should I have to move to San Diego or Jacksonville when I got a promotion to be the general manager and I've done that well?"  Doc. 10, Ex. 1 at 70.  Collins also stated when Eisenbeiss "was offering [her] publishing positions, I kept saying to Bill [Eisenbeiss], I shouldn't have to take a subordinate job to be paid the same."  Doc. 10, Ex. 1 at 73; Doc. 10, Ex. 2 at ¶ 28.  Eisenbeiss' offers occurred after Collins voiced her salary complaints.  Doc. 10, Ex. 1 at 59, 70; Doc. 15, Ex. 1 at 180.  According to Collins, after disputing her pay, Eisenbeiss attempted to refer to her position as "chief of staff" or a "developmental position."  Doc. 15, Ex. 2 at ¶ 9.

A permanent publisher has responsibility for hiring, firing and evaluating employees; budgeting and managing the sales of the newspaper; publishing the paper with an appropriate

design and content; participating in community events (often on nights and weekends);

recommending rate changes for the publication; tracking the revenues and expenses of the paper;

and bearing ultimate accountability for the profitability of the paper.  Doc. 10, Ex. 3 at ¶¶ 9-13;

Doc. 10, Ex. 4 at ¶¶ 9-10; Doc. 10, Ex. 6 at ¶¶ 40-41; Doc. 15, Ex. 2 at ¶ 6.  Collins

acknowledged the differences between a start-up and permanent publisher positions in

conversation with Jim Connors ("Connors"), a permanent publisher for the Jacksonville paper.

Doc. 10, Ex. 4 at ¶¶ 1, 8.  Specifically, Connors states:

> In late 2004 I traveled to Norfolk for a training session and had dinner with Ms. Collins as well as Bill Eisenbeiss.  After dinner I had a conversation with Ms. Collins where she expressed some of her pay complaints to me.  I asked her why she had never applied to be a Permanent Publisher, if she believed that that position paid better.  She responded that she thoroughly enjoyed the challenges of the frenetic startup period but did not think that she would enjoy the responsibilities of being a Permanent Publisher.

Doc. 10, Ex. 4 at ¶ 8.  Collins has not disputed making this statement.  See Docket No.

2:06cv342.

Collins began complaining about her compensation in May of 2004, arguing she should

be paid more than permanent publishers, whose jobs she viewed as inferior.  Doc. 10, Ex. 2 at ¶

31.  In response to Collins' complaints, Eisenbeiss explained the jobs of general manager and

permanent publisher were completely different, and offered her a pay increase to $77,625 per

year.  Doc. 10, Ex. 2 at ¶¶ 32-34; Doc. 15, Ex. 21 at 1.  Eisenbeiss also directed that a survey be

conducted "comparing Ms. Collins' salary to those of similar employees at other entities."  Doc.

10, Ex. 2 at ¶ 35.  Comparable positions at other companies showed the appropriate pay range to

be $65,000 to $75,000 per year, below Collins' then salary.  Doc. 10, Ex. 2 at ¶¶ 32, 35-36; Doc.

16, Ex. 4 (General Manager Pay Analysis).

5. *Start-up and Temporary Publisher Roles*

As noted, Collins also acted as a "start-up publisher" for Landmark in Jacksonville and Texas.  Doc. 10, Ex. 1 at 47.  Additionally, she served as a temporary publisher in Jacksonville from July of 2004 until September of 2004.  Doc. 15, Ex. 2 at ¶ 12.

The start-up publisher borrows employees from other geographic locations, lays down the infrastructure of the start-up newspaper, and eventually releases the borrowed employees in order to hire permanent employees from the same area as the paper.  Doc. 10, Ex. 1 at 50; Doc. 15, Ex. 5 at 16.  The start-up publisher is concerned about profits during the initial months of operation, but in a different way from a permanent publisher.  Doc. 10, Ex. 1 at 50-51.  According to Collins, a start-up publisher could be removed for making poor budget decisions.  Doc. 10, Ex. 1 at 55.  As a start-up publisher, Collins did not evaluate the performance of the borrowed employees, but was required to be involved in the community.  Doc. 10, Ex. 1 at 51, 55.  A start-up publisher has unique responsibilities, challenges, and powers that a permanent publisher does not have.  Doc. 15, Ex. 2 at 86-109; Doc. 15, Ex. 5 at 16-24 (Beth Johnson stating, in part, on page 18, in regards to the additional difficulties of a start-up publisher position as opposed to the permanent publisher position, "There's just a lot more potential for things to go wrong and it's a lot more challenging. . ." ).  The start-up publisher is not required to move permanently to the newspaper location, nor to sign a non-competition agreement.  Doc. 10, Ex. 2 at ¶ 31; Doc. 16, Ex. 1 at 70 (Collins stating she did not want to move permanently to another location).  Additionally, Landmark must pay the additional travel and lodging expenses incurred by a start-up publisher that are not present with a permanent publisher.  Doc. 10, Ex. 2 at ¶ 9.

As the start-up publisher in Jacksonville, North Carolina, from June of 2002 until August

of 2003, Collins did not participate in the initial budget planning.  Doc. 10, Ex. 1 at 52; Doc. 15, Ex. 2 at ¶ 12.  Collins knew her position was as a temporary publisher, and that she would only be staying in Jacksonville during the week.  Doc. 16, Ex. 1 at 86 (Collins Deposition dated February 8, 2007).  Collins was authorized to hire and fire employees as start-up publisher in Jacksonville, and was responsible for planning the subsequent year's budget.  Doc. 15, Ex. 2 at 82-83, 85. Plaintiff worked extremely hard while acting as the start-up publisher in Jacksonville.  Doc. 15, Ex. 5 at 24.  In this capacity, Collins did not have time to fully invest herself in the community, as would a permanent publisher, because her role was to make the paper operational.  Doc. 10, Ex. 1 at 159-60.  Accordingly, at Jacksonville, Collins focused on getting "the newspaper out on time every week," "increas[ing] . . . distribution efforts," and training and hiring employees.  Doc. 10, Ex. 1 at 159-60.  By contrast, the permanent publisher's role in Jacksonville required more community involvement and maintenance of the operation.  Doc. 10, Ex. 1 at 159-60.  On some, but not all weekends, Collins was allowed to return to visit her husband, from her post at the start-up newspaper.  Doc. 10, Ex. 1 at 56.  Collins was not held responsible for the Jacksonville newspaper's loss of $430,873 during her tenure.  Doc. 10, Ex. 2 at ¶ 14.  As noted, this period of employment is outside the time frame for both the Title VII and Equal Pay Act claims.

Collins acted as a start-up publisher in Texas from mid-December of 2003 through April of 2004.  Doc. 15, Ex. 2 at ¶ 12; Doc. 10, Ex. 2 at ¶ 21.  She "was very active in planning and putting together [] the budget."  Doc. 10, Ex. 1 at 52.  Collins did not bear the same responsibility of a permanent publisher in Texas, as Coleman "managed the distribution effort of the entire paper."  Doc. 10, Ex. 2 at ¶ 22;  Doc. 15, Ex. 6 at 22 (Pennington Deposition dated April 12,

2007).  However, Collins was authorized to negotiate the Texas newspaper's contract with the

Army.  Doc. 15, Ex. 6 at 17-18.  The Texas paper lost $325,760 during Collins' short tenure as

start-up publisher, but Collins was not held accountable in light of her differing duties as start-up

publisher.  Doc. 10, Ex. 2 at ¶ 23.  Collins received a bonus of $4,500 for her assistance with the

Texas paper.  Doc. 10, Ex. 2 at ¶ 24.  J.C. Pennington ("Pennington") was hired as permanent

publisher for the Texas paper, and received a total of $80,130.67 for one full year of employment,

in salary and bonuses.  Doc. 10, Ex. 2 at ¶ 25.  Collins earned approximately $90,000 in 2004.

Doc. 10, Ex. 2 at ¶ 25.  Pennington had previously earned over $100,000 per year in other

employment positions.  Doc. 10, Ex. 2 at ¶ 25.  Pennington, who was held responsible for profits

and losses as the permanent publisher in Texas, was fired solely for failing to run a profitable

business.  Doc. 10, Ex. 2 at ¶ 25; Doc. 10, Ex. 6 at 40-41; See Doc. 10, Ex. 4 at ¶¶ 9-10 (Jim

Connors, the Jacksonville publisher, states he could be fired for failing to achieve profits as a

permanent publisher).  Again, this time period is before the time period concerned by the Title

VII and Equal Pay Act claims.

    In addition to acting as a start-up publisher, Collins worked as a temporary publisher in

Jacksonville from July of 2004 to September of 2004, after Rick Wilson had been terminated.

Doc. 15, Ex. 2 at ¶ 12; Doc. 10, Ex. 1 at 133.  For her efforts, she received a bonus of $3,341.70.

Doc. 10, Ex. 1 at 132-33.  Eisenbeiss states Collins received Wilson's identical salary and bonus

structure while assisting in Jacksonville.  Doc. 10, Ex. 2 at ¶¶ 26-27.  Collins counters that

Wilson earned 15.4% more than her for equal time worked in 2004.  Doc. 15, Ex. 2 at ¶ 32.

Connors was hired to act as permanent publisher in Jacksonville beginning in September of

2004, and was paid a salary of $80,000 per year with the identical bonus structure given to other

permanent publishers.  Doc. 10, Ex. 2 at ¶ 30; Doc. 10, Ex. 4 at ¶¶ 1, 3; Doc. 15, Ex. 22 at 26-29

(Connors Deposition dated March 26, 2007).  Connors had a history of earning over $100,000 per

year when he was hired.  Doc. 10, Ex. 2 at ¶ 30; Doc. 10, Ex. 4 at ¶ 2.

### 6. *Comparators*

For purposes of this lawsuit, Collins compares herself to Landmark's other employees,

Wilson, Pennington, and Connors.  Doc. 10, Ex. 1 at 36.  Additionally, Collins notes Peter Lynch

("Lynch") turned down an offer to work for Landmark at a salary significantly higher than her

salary.  Doc. 10, Ex. 1 at 36.[6]

### 7. *Collins' Employment History Since Landmark*

Collins left Landmark at the end of December of 2004, and began selling metal for E.J.

Enterprises, based in Glen Burnie, Maryland, in March of 2005.  Doc. 10, Ex. 1 at 15.  She

worked in that capacity until January of 2006.  Doc. 10, Ex. 1 at 15-16.  Over the course of her

employment, Collins earned $50,000 to $55,000.  Doc. 10, Ex. 1 at 16-17.

From early February of 2006 until the beginning of 2007, Collins worked for the Daily

Press in Williamsburg, earning $55,000 per year, and received two bonuses in the $3,000 to

$4,000 range.  Doc. 10, Ex. 1 at 11-12.  While at the Daily Press, Collins applied for three other

positions within the organization, but was not hired because she "hadn't been in [her] position

long enough and [her team] missed [their] sales goal two months in a row."  Doc. 10, Ex. 1 at 13-

14.

---

[6] Lynch is not an adequate comparator because he never worked for the company, because he was offered a position with Landmark in 2003, outside of the limitations period, and for the reasons stated in Section V of this Opinion and Order.  Doc. 16 at 23.  Pennington is also not a valid comparator, as Collins' efforts in Texas occurred outside the limitations period.

Collins stated that her salary never exceeded the range of $60,000 to $65,000 both before and after her employment with Landmark.  Doc. 10, Ex. 1 at 32-33.

### 8. *Time Frame Simplified*

In summary, the time frame of Collins' employment with Landmark is as follows.  In May of 2002, she was hired to work in a sales position, earning $60,000 per year.  In June of 2002, she was promoted to start-up publisher for Landmark's Jacksonville newspaper with the same salary.  Collins earned $7,500 in bonuses from Landmark during 2002.

In May of 2003, Collins' salary was increased to $75,000 per year, the amount she requested.  In August of 2003, Collins was promoted to general manager, and relieved of her start-up publisher position in North Carolina, as Wilson was hired as publisher of the newspaper.  Plaintiff served as a start-up publisher in Texas from December of 2003 to April of 2004.  In May of 2004, Eisenbeiss recommended a salary increase for Collins to $77,625 per year, which she received.  Collins substituted as a temporary publisher in Jacksonville from July of 2004 to September of 2004.

The Title VII claim must be substantiated by a violation occurring since June 10, 2004, and the Equal Pay Act transgression must have occurred since June 20, 2004.

Collins earned $4,500 in bonuses in 2004, and resigned at the end of the year.

### III.  MOTION FOR ENLARGEMENT OF TIME TO RESPOND TO MOTION FOR SUMMARY JUDGMENT

Defendant filed its Motion for Summary Judgment on April 20, 2007.  Doc. 9.  Defendant's certificates of service indicate the Motion and accompanying Memorandum were "sent by electronic mail and by hand delivery" to counsel for Plaintiff on the same day.  Doc. 9 at

2; Doc. 10 at 31.  Under LOCAL CIVIL RULE 7(F)(1), Plaintiff had until May 1, 2007 to respond to

the motion.  On May 1, 2007, within the response period, Plaintiff filed its Motion for

Enlargement of Time to Respond to Defendant's Motion for Summary Judgment, and supporting

Memorandum.  Docs. 13, 14.  Therein, Plaintiff concedes receiving the Motion for Summary

Judgment on April 20, 2007, and correctly states the due date for a response as May 1, 2007.

Doc. 14 at 1; LOCAL CIV. R. 7(F)(1).  Additionally, Plaintiff states "Defendant consents to this

extension," and "requests an enlargement of one day" due to the "factually intensive" nature of

the motion, the significant number of arguments are raised therein, and because of the packed

schedule of Plaintiff's counsel.  Doc. 13 at 1; Doc. 14 at 1.  Plaintiff's Memorandum in

Opposition to the Motion for Summary Judgment was filed on May 3, 2007, after both the

original filing deadline and the requested extension date.  Doc. 15.

Because it aids the Court's decisional process and the filing is only two (2) days late, the

Court **GRANTS** Plaintiff's Motion for Enlargement of Time to Respond to Motion for Summary

Judgment, and considers Plaintiff's filing in Response to Defendant's Motion for Summary

Judgment.


## IV.  MOTION FOR SUMMARY JUDGMENT: LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  FED. R. CIV. PROC. 56(c).  "[T]he plain

language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Indeed, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Also, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23. "As to materiality, the substantive law will identify which facts are material." Anderson, 477 U.S. at 248. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim," Celotex, 477 U.S. at 323, and Rule 56(c) limits the Court's consideration to certain documentary evidence, listing "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." FED. R. CIV. PROC. 56(c). Notably, "a party's affidavit which contradicts his own prior testimony should be disregarded on a motion for summary judgment" in certain circumstances, such as where the party is using affidavits to create "sham issues of fact."

Shockley v. City of Newport News, 997 F.2d 18, 23 (4th Cir. 1993) (citing Mack v. United States, 814 F.2d 120, 124 (2nd Cir. 1987)); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (refusing to consider, for summary judgment purposes, a "conclusory" affidavit of "a party who has been examined at length on deposition" which did not set forth the plaintiff's "personal knowledge" and which "contradict[ed] his own prior testimony"); Shaw v. Stroud, 13 F.3d 791, 804 (4th Cir. 1994) (distinguishing Barwick and affirming the court's decision not to strike a deposition which was factually dissimilar to the affidavit in Barwick); Salvin v. Am. Nat'l Prop. & Cas. Co., No. 2:06cv264, 2006 U.S. Dist. LEXIS 79721, at *10-11 (E.D. Va. October 31, 2006) (Friedman, J.) (unpublished) (following Barwick and concluding an affidavit was "conclusory and consist[ed] entirely of generalities" in limiting its significance for summary judgment purposes); Alba v. Merrill Lynch & Co., 198 Fed. Appx. 288, 300 (4th Cir. 2006) (unpublished) (following Barwick and determining an affidavit contradicting the prior deposition testimony did not create a genuine issue of material fact).

## V.  EQUAL PAY ACT CLAIM

Plaintiff alleges Defendant violated the Equal Pay Act of 1963, by paying her less than her male counterparts for substantially equal work.  Doc. 1.  29 U.S.C. § 206(d)(1) provides, in pertinent part,

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system;

(iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . .

A.  Statute of Limitations and Relevant Evidence

A cause of action must be commenced, under the Equal Pay Act, "within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  "[E]ach issuance of a paycheck to a female employee at a lower wage than that issued to her male counterpart constitutes a new discriminatory action for purposes of Equal Pay Act limitations accrual."  Brinkley-Obu v. Hughes Training, 36 F.3d 336, 347 (4th Cir. 1994); Jenkins v. Home Ins. Co., 635 F.2d 310, 312 (4th Cir. 1980).[7]  The Court may not normally redress any injury that occurred outside of the limitations period, except where a continuing violation is shown. Brinkley-Obu, 36 F.3d at 346 ("The statute of limitations applicable to Equal Pay Act and Title VII violations constitute a jurisdictional bar that operates in relation to the injury to the plaintiff."); Tinsley, 155 F.3d at 442 (citation omitted).  Before allowing the Plaintiff "to prosecute claims of discrimination" outside the statutory time period under a continuing violation theory, the Court "must first conclude that there was a present violation."  Tinsley, 155 F.3d at 442-43 (citation omitted).  However, the Court may still consider evidence from before the limitations period, but may not redress prior injuries.  Brinkley-Obu, 36 F.3d at 346 (stating the statute of limitations acts as a "jurisdictional bar that operates in relation to the injury to the plaintiff" but does "not operate as an evidentiary bar controlling the evidence admissible at the

_____

[7] The Supreme Court of the United States' recent opinion in Ledbetter v. Goodyear Tire & Rubber Co., Inc., No. 05-1074, slip op. at 21 (May 29, 2007), does not affect the accrual period of the Equal Pay Act.

19 of  40

trial of a timely-filed cause of action"). Specifically, "the statute of limitations does not operate to limit the evidence [Plaintiff] may introduce regarding her co-workers." <u>Brinkley-Obu</u>, 36 F.3d at 346.

### 1. *Limitations Period & Motion to Amend the Complaint*

Plaintiff does not allege a willful violation of the Equal Pay Act in her Complaint. Doc. 1 at 4. Defendant asserts that Plaintiff's failure to allege a willful violation in the Complaint "results in application of the two-year statute of limitations." Doc. 10 at 14 n.3 (citing numerous non-precedential authorities).

In response to Defendant's argument regarding the insufficiency of the Complaint, Plaintiff filed a Motion for Leave to File First Amended Complaint on May 9, 2007. Doc. 18. As indicated by the motion's caption, the May 9, 2007 motion is the first motion to amend filed by Plaintiff. <u>See</u> Docket No. 2:06cv342. Plaintiff's only material change to the Complaint is to include the statement, "Landmark willfully violated the Equal Pay Act in taking the actions complained of herein." Doc. 19, Ex. 1 at 4 (Red-lined copy of First Amended Complaint).

F<span style="font-variant:small-caps">ED</span>. R. C<span style="font-variant:small-caps">IV</span>. P. 15(a) provides "leave [to amend a party's pleading] shall be freely given when justice so requires." Additionally, "motions to amend are to be granted in the absence of a 'declared reason' such as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, futility of amendment, etc." <u>Ward Elecs. Serv., Inc. v. First Commercial Bank</u>, 819 F.2d 496, 497 (4th Cir. 1987) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)) (overturning district court refusal to allow second amended complaint). Furthermore, "the fact that an amendment changes the plaintiff's theory of the case will not suffice as a reason for denial absent a showing of prejudice,

bad faith, futility, or dilatoriness associated with the motion." Ward, 819 F.2d at 497.  Defendant

argues Plaintiff should not be allowed to amend its Complaint for reasons of undue delay, and

prejudice to the Defendant.  Doc. 24 at 3-5 (citing Harding v. Kellam, 155 F.3d 559 (4th Cir.

1998) (table opinion); Sandcrest Outpatient Servs., P.A. v. Cumberland County Hosp. Sys., 853

F.2d 1139, 1148-49 (4th Cir. 1988); E. David Gable & Assoc. v. Dean Witter Reynolds, Inc., 166

F.2d 332 (4th Cir. 1998) (table opinion); United States v. Genetics & IVF Institute, Inc., 199 F.3d

1328 (4th Cir. 1999); and other non-precedential authorities).  Specifically, Defendant argues the

motion to amend the complaint was made "years after the events allegedly giving rise to her

claims[, . . . ] almost a year after Plaintiff filed her Complaint[, . . . ] after the close of discovery

and on the very eve of a summary judgment hearing for which all briefs had already been filed."

Doc. 24 at 4.  Additionally, regarding prejudice to Defendant, Landmark asserts it "drafted these

briefs to respond to Plaintiff's original Complaint using strategies that assumed the lack of

allegation of willfulness."  Doc. 24 at 5.  However, it appears that Defendant's opening brief

considers the possibility that Plaintiff's complaint is not fatal, arguing in the alternative that "even

if Plaintiff had alleged willfulness, there is no genuine issue of material fact related to this issue."

Doc. 10 at 14 n.3.  Accordingly, because it does not appear that granting Plaintiff's motion would

prejudice Defendant in any way or delay the proceedings, the Court **GRANTS** Plaintiff's Motion

for Leave to File First Amended Complaint, and hereby **DIRECTS** the Clerk to docket Plaintiff's

filing captioned First Amended Complaint.  Docs. 18, 19.

### 2. *Two or Three Year Statute of Limitations Period*

Regardless of whether willfulness is properly pleaded, as stated above, "[u]nsupported

speculation is not sufficient to defeat a summary judgment motion."  Felty, 818 F.2d at 1128

(citation omitted).   In <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 129, 133 (1998), the

Supreme Court of the United States defined "the meaning of the word 'willful' as used in the

statute of limitations applicable to civil actions" in 29 U.S.C. § 255(a) to require "that the

employer knew or showed reckless disregard for the matter of whether its conduct was prohibited

by the statute."  Where the Plaintiff "adduce[s] no evidence of willfulness" the two-year period of

limitations is properly applied.  <u>Blount v. Thompson</u>, 400 F. Supp. 2d 838, 843 (D. Md. 2004)

(Messitte, J.), <u>aff'd</u>, 122 Fed. Appx. 64 (4th Cir. 2005) (unpublished), <u>cert. denied</u>, 546 U.S. 1043

(2005).

     Defendant urges that there is no evidence from which to conclude that Defendant willfully

violated the Equal Pay Act.  Doc. 10 at 14 n.3.  Plaintiff rebuts that evidence of willfulness is

shown from the testimony and declaration of Collins.  Doc. 15 at 14.  Specifically, Plaintiff cites

Collins' deposition, which provides:

> Q:     The last question I want to ask you before we take a short break is, do you believe
>        that Bill Eisenbeiss intentionally discriminated against you because of your
>        gender?
>
> A:     I have never believed that Bill would maliciously, intentionally discriminate
>        against me.  I believe Bill is old school and views women differently than men and
>        viewed me differently from the men, and I don't think it's anything that he
>        purposefully premeditates to do.  I think it's a part of who he is.  My way of
>        thinking, that doesn't excuse it.  You know, it's still discrimination.  And I think
>        that's why he couldn't see some of the things that happened were not okay.
>
> . . .
>
> Q:     Why do you believe that Mr. Eisenbeiss was paying you less than Mr. Wilson was
>        being paid?
>
> A:     Over the time that I worked for Bill, I firmly believe that Bill views women
>        differently than men.  And I think a white male in his 50s automatically gets the
>        respect from Bill that just is given regardless of any real – real evidence to warrant

that.

Doc. 15, Ex. 4 at 199, 209.  Second, Collins also points to her recently signed Declaration as

evidence of willfulness, which provides,

> Mr. Eisenbeiss treated me, in pay and as related above, in a discriminatory manner.  His
> conduct was intentional. He views women in starkly different terms than men.  I believe
> that his attitudes are intrinsic to his nature and "hard-wired."  It is clear to me that Jim
> Coleman shared his view.

Doc. 15, Ex. 2 at ¶ 43.[8]  Plaintiff lastly states willfulness is shown from the pay differential

between Plaintiff and her comparators, the alleged statement of another employee to Plaintiff

suggesting that Plaintiff would not be treated fairly by her supervisor at Landmark, the salaries

and pay offer to other employees, the "excuses" offered by Landmark in defense of the pay

differentials, and Eisenbeiss' concession that Collins' initial salary was set too low.  Doc. 15 at

23.  The Court finds that none of this proffered evidence shows willfulness, but rather is merely

relevant to a general violation of the Equal Pay Act.  The Court agrees with Defendants'

assessment of Collins' deposition testimony and declaration as arguably showing a subconscious

bias against women, but not evidencing a willful intention as defined in McLaughlin, 486 U.S. at

133.  Willfulness as defined in McLaughlin requires "that the employer knew or showed reckless

disregard for the matter of whether its conduct was prohibited by the statute."  486 U.S. at 133.

Collins' statements, taken as a whole and in the light most favorable to Collins, show that

Eisenbeiss may have treated men and women differently, but did not know or disregard whether

his conduct was prohibited by statute.  Accordingly, the Court considers only those injuries

---

[8] To the extent Collins' recent declaration contradicts her earlier deposition testimony,
the Court concludes the declaration is of no weight, as it appears offered merely to create a sham
issue of material fact which is not permitted for the reasons stated in Section IV of this Opinion
and Order.

incurred during the two year limitations period prior to the filing of the Complaint, from June 20,

2004 until the employment ended.  Doc. 1 (Complaint filed June 20, 2006).

### B.  Definition of Establishment

As noted, the Equal Pay Act states,

> No employer having employees subject to any provisions of this section shall
> discriminate, within any *establishment* in which such employees are employed, between
> employees on the basis of sex by paying wages to employees in such *establishment* at a
> rate less than the rate at which he pays wages to employees of the opposite sex in such
> *establishment* for equal work on jobs the performance of which requires equal skill, effort,
> and responsibility, and which are performed under similar working conditions, except . . .

29 U.S.C. § 206(d)(1) (emphasis added).  Accordingly, the Equal Pay Act requires employee pay

scales to be measured "within any establishment in which such employees are employed."  29

U.S.C. § 206(d)(1).  Defendant argues that "Plaintiff cannot even compare her compensation

while in Norfolk to the compensation of the publishers because the EPA does not allow

comparisons between different 'establishments' . . . [which are] distinct physical place[s] of

business rather than . . . [the] entire business or enterprise which may include several separate

places of business."  Doc. 10 at 19 n.6 (citing 29 U.S.C. § 206(d); Jacobsen v. Pitman-Moore,

Inc., 573 F. Supp. 565, 568 (D. Minn. 1983); and Meeks v. Computer Assocs. Int'l, 15 F.3d 1013,

1017 (11th Cir. 1994)).  Defendant asserts Plaintiff's comparison is improper because Collins was

based in Norfolk, while her comparators "operated out of a distinct office in either North Carolina

or Texas."  Doc. 10 at 19 n.6.

29 C.F.R. § 1620.9 defines the meaning of establishment as "a distinct physical place of

business rather than [] an entire business or 'enterprise' which may include several separate

places of business."  29 C.F.R. § 1620.9(a).  The Code of Federal Regulations acknowledges that

"each physically separate place of business is ordinarily considered a separate establishment . . . [, but] unusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment."  29 C.F.R. § 1620.9(a) and (b).  "For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions."  29 C.F.R. § 1620.9(b). Absent a verified allegation that special circumstances exist which justify disregarding the normal establishment limitation, Plaintiff is required to present comparators in her distinct physical place of business.  Moser v. Pizza Hut of Am., No. 97-0046-D, 1998 U.S. Dist. LEXIS 6256, at *27-28 (W.D. Va. April 9, 1998) (Kiser, J.) (unpublished); but see Grumbine v. United States, 586 F. Supp. 1144, 1148 (D.C. 1984) (Greene, J.) ("It is clear from these decisions that, at least for purposes of public employment, the geographic reach of the term 'establishment' is not automatically determined by geography, as the government would have it, but depends upon the degree to which the particular governmental entity has centralized its personnel administration.") (decided prior to the publication of 29 C.F.R. § 1620.9).  Accordingly, the Court considers the geographical distinctions in weighing Collins' prima facie case under the Equal Pay Act.

C.  Prima Facie Case

In addition to showing that the work performed by Collins was performed at the same establishment, the Plaintiff must show that the work was substantially equal to that performed by another male employee who received a higher wage[9].  This other male employee, known as a

---

[9] The Code of Federal Regulations defines "wages" broadly to include "all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum,

"comparator," must be a real person and not "a hypothetical or 'composite' male."  Strag v. Board of Trs., 55 F.3d 943, 948 (4th Cir. 1995) (citation omitted).  Failure "to identify an appropriate comparator" is fatal to Plaintiff's claim under the Equal Pay Act.  Strag, 55 F.3d at 950.  To establish a prima facie case under the Equal Pay Act, "the plaintiff bears the burden of showing that she (1) receives lower pay than a male co-employee [, the "comparator,"] (2) for performing work substantially equal[10] in skill, effort, and responsibility under similar working conditions."  Strag, 55 F.3d at 948 (citation omitted).  Additionally, "[t]he comparison between the plaintiff's job and that of the male comparator should be made factor by factor."  Gray v. Winter, No. 2:05cv433, 2006 U.S. Dist. LEXIS 29449, at *22 (E.D. Va. April 25, 2006) (Friedman, J.) (unpublished).  Whether the jobs are "substantially equal" is determined by comparing a "common core of tasks" against any "differing or additional tasks."  Brewster v. Barnes, 788 F.2d 985, 991 (4th Cir. 1986) (citations and internal quotations omitted).

### 1.  *Comparing Jobs by Tasks not Titles*

"Equal work" is not shown "when two employees have similar titles but responsibilities that bear no more than the most general resemblance."  Wheatley, 390 F.3d at 330.  Particularly, "one can have the same title and the same general duties as another employee, and still not meet

---

bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name."  29 C.F.R. § 1620.10.

[10] Brinkley-Obu, 36 F.3d at 343 ("The equal work standard does not require that compared jobs be identical, only that they be substantially equal.") (citing 29 C.F.R. §1620.13(a)); but see Wheatley v. Wicomico County, 390 F.3d 328, 332, 333 (4th Cir. 2004), cert. denied, 544 U.S. 1032 (2005) ("In interpreting the EPA, 'equal means substantially equal.' . . . In enacting the EPA, Congress chose the word 'equal' over the word 'comparable' in order 'to show that the jobs involved should be virtually identical, that is . . . very much alike or closely related to each other.'") (citations omitted).

two textual touchstones of the EPA - equal skills and equal responsibility." <u>Wheatley</u>, 390 F.3d at 332; <u>EEOC v. Universal Underwriters Ins. Co.</u>, 653 F.2d 1243, 1245 (8th Cir. 1981) ("Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job."); 29 C.F.R. § 1620.13(e).  Jobs may be considered unequal, "despite having the same core responsibilities" if the higher paid job "require[s] extra effort, consumes a significant amount of time . . . and [is] of an economic value commensurate with the pay differential." <u>Wheatley</u>, 390 F.3d at 333.

> 2. *Differences in Skill, Effort or Responsibility Not Detracting from Plaintiff's Case*

"Differences in skill, effort, or responsibility which might be sufficient to justify a finding that two jobs are not equal within the meaning of the EPA if the greater skill, effort or responsibility has been required of the higher paid sex, do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex." <u>Brinkley-Obu</u>, 36 F.3d at 342 n.12 (citing 29 C.F.R. § 1620.14(a)).

> 3. *Skill*

"The jobs to which the equal pay standard is applicable are jobs requiring equal skill in their performance." 29 C.F.R. § 1620.15(a).  "Skill includes such considerations as experience, training, education, and ability." <u>Universal</u>, 653 F.3d at 1245; 29 C.F.R. § 1620.15(a); <u>Rapson v. Development Auth. of Peachtree City</u>, No. 3:02-CV-7-JTC, 2004 U.S. Dist. LEXIS 12579, at  *9-10 (N.D. Ga. March 31, 2004) (Camp, J.) (unpublished).

> 4. *Effort*

"Effort refers to the physical or mental exertion necessary to the performance of a job." <u>Universal</u>, 653 F.3d at 1245; <u>Rapson</u>, 2004 U.S. Dist. LEXIS 12579, at *10 (distinguishing the

plaintiff from the comparator based on the number of hours worked and number of hours on call);

29 C.F.R. § 1620.16(a).  Furthermore, "'effort' encompasses the total requirements of a job."  29

C.F.R. § 1620.16(a).

### 5. *Responsibility*

"Responsibility concerns the degree of accountability required in performing a job."

Universal, 653 F.3d at 1245; 29 C.F.R. § 1620.17(a) (further emphasizing "the importance of the

job obligation.").  The degree of financial risk born by the comparator and the Plaintiff is a factor

for determining whether the two perform equal work.  Jacobs v. College of William & Mary, 517

F. Supp. 791, 797 (E.D. Va. 1980), aff'd without opinion, 661 F.2d 922 (4th Cir. 1981), cert.

denied, 454 U.S. 1033 (1981) (concluding disparate financial pressures show work performed by

male and female basketball coaches was not equal under the Equal Pay Act); Rapson, 2004 U.S.

Dist. LEXIS 12579, at *10 (noting the comparator was "responsible for the ultimate profit or loss

of the pro shop and earns less compensation if the pro shop performs poorly" in contrast to the

Plaintiff, who bore "no similar financial risk"); Stanley v. University of Southern California, 13

F.3d 1313, 1321-22 (9th Cir. 1994) (noting differences between male and female basketball

coaching jobs, which include "substantial public relations and promotional activities to generate

revenue for USC" to be performed by the male coach, and the pressure on the male coach to

produce "a large amount of revenue"); Cullen v. University Bd. of Trs., 338 F.3d 693, 700 (7th

Cir. 2003).  Also, the relative supervisory responsibilities of the comparator and the Plaintiff

affect whether the work performed is substantially equal.  Gu v. Boston Police Dep't, 312 F.3d 6,

16 (1st Cir. 2002); Cullen, 338 F.3d at 700 ("[I]t is reasonable to conclude that Dr. Quillen's

management of a department twice the size of Dr. Cullen's is indicative of greater

responsibility."); <u>McLaughlin v. Esselte Pendaflex Corp.</u>, 50 F.3d 507, 514 (8th Cir. 1995).

6. <em>Analysis</em>

Collins states she was paid less than her comparators, and thereby establishes prong one of her <u>prima facie</u> case.

Collins also has adduced a sufficient evidentiary basis under prong two, which requires her to show that she "perform[ed] work substantially equal in skill, effort, and responsibility under similar working conditions" to her male comparators.  <u>Strag</u>, 55 F.3d at 948 (citation omitted).  In comparing the common tasks of the respective positions, general manager and permanent publisher, against their differing or additional tasks, the Court finds the positions are substantially similar under the Equal Pay Act.  Particularly, while the Court does not find Collins' efforts in Norfolk comparable to the work of other employees in North Carolina, the Court does find her employment as a temporary publisher in North Carolina from July of 2004 to September of 2004 is substantially equal to the work performed by both her predecessor and successor publishers at that location.

Specifically, the Court finds Collins' work as general manager acting in Norfolk was not substantially equal to that of a permanent publisher in another location.  Notably, for the reasons set forth in Section V(B) of this Opinion and Order, Collins cannot compare her activities in Norfolk to those of other employees in North Carolina, as the Equal Pay Act precludes comparison of jobs across establishments.  Collins has set forth no reason to broaden the meaning of establishment beyond the typical construction of a physically distinct workplace.  Second, Collins' duties as general manager, while working in Norfolk and not substituting as a temporary or permanent publisher, were vastly distinct from those of the permanent publishers.

Third, Collins' financial responsibility as general manager in Norfolk was different from that borne by permanent publishers.

To the contrary, the permanent and temporary publisher positions are substantially equal in terms of obligations and responsibilities.  Particularly, the Court notes Collins served as a temporary publisher in Jacksonville from July of 2004 until September of 2004.  Doc. 15, Ex. 2 at ¶ 12.  During that time, she worked at the same establishment as her comparators, Wilson and Connors.  Doc. 10, Ex. 1 at 133; Doc. 10, Ex. 2 at ¶ 30; Doc. 10, Ex. 4 at ¶¶ 1, 3; Doc. 15, Ex. 22 at 26-29 .  Contrary to the assertion of Eisenbeiss, Collins states she earned 15.4% less than Wilson for equal time worked in 2004.  Doc. 10, Ex. 2 at ¶¶ 26-27; Doc. 15, Ex. 2 at ¶ 32.  Collins also alleges "Connors' total income for the period in which he worked for [Landmark] in 2004 was at least 30% higher than" Collins' income during that time period.  Doc. 15, Ex. 2 at ¶ 35.  While Defendant argues the jobs of start-up publisher and permanent publisher are different in terms of responsibility, financial liability and community commitment, Defendant furthers no similar argument or facts showing that the temporary and permanent publisher positions are distinct under the Equal Pay Act.  Doc. 10 at 15-24; Doc. 16 at 1-16.  Rather, Defendant merely states "Plaintiff spent the vast majority of her time as general manager working from Norfolk," while contrasting the general manager duties in Norfolk against the responsibilities of permanent publishers, and distinguishing the permanent and start-up publisher roles.  Doc. 10 at 18, 15-24.  The Court gives little weight to Collins' title of general manager in assessing the work she performed in Jacksonville, North Carolina, from July of 2004 to September of 2004.  Wheatley, 390 F.3d at 330; 29 C.F.R. § 1620.13(e).  Additionally, the alleged facts show Collins was also saddled with her responsibilities in Norfolk while attending to the publisher role in North

Carolina.  However, these additional burdens do not bear against Collins.  <u>Brinkley-Obu</u>, 36 F.3d at 342 n.12 (citing 29 C.F.R. § 1620.13(e)).  Defendant also argues Collins was paid equal to or better than her comparators during her period in North Carolina in 2004.  Doc. 16 at 7.  As Collins' declaration asserts, with specificity, that she was paid less that her comparators, a material issue of fact exists as to whether she was paid less.  Doc. 15, Ex. 2 at ¶¶ 32, 35.  Because there is no appreciable difference between the work performed by Connors and Wilson in North Carolina in 2004, and the work performed by Collins in 2004 in North Carolina, the Court concludes Collins has presented a <u>prima facie</u> case under the Equal Pay Act for the period of July of 2004 to September of 2004.

D.  <u>Shifting Burden</u>

1. *Legal Principles*

If the Plaintiff establishes a <u>prima facie</u> case against her employer, "the burden shifts to the employer to prove, by a preponderance of evidence, that the pay differential is justified by the existence of one of the four statutory exceptions set forth in [29 U.S.C.] § 206(d)(1)."  <u>Strag</u>, 55 F.3d at 948 (citation omitted); <u>EEOC v. Whitin</u>, 635 F.2d 1095, 1097-98 (4th Cir. 1980) (citations omitted).  The burden shift in an Equal Pay Act case requires the Defendant to bear both the "burden of production and persuasion . . . to show, by a preponderance of the evidence, that the wage differential resulted from one of the allowable causes enumerated by the statute." <u>Brinkley-Obu</u>, 36 F.3d at 344 (citing <u>Fowler v. Land Mgmt. Groupe</u>, 978 F.2d 158, 161 (4th Cir. 1992)).  These exceptions include "(1) a seniority system, (2) a merit system, (3) a system that measures earnings by quantity or quality of production, or (4) a differential based on any factor other than sex."  <u>Strag</u>, 55 F.3d at 948 (citation omitted); 29 U.S.C. § 206(d)(1).  The Court may

consider evidence of the competing experience and qualifications of the comparator(s) and
Plaintiff, their relative salary histories, and the research undertaken by the employer to reach the
salary given to the Plaintiff, in determining whether Defendant has established sufficient evidence
of a differential based on any factor other than sex.  Brinkley v. Harbor Recreation Club, 180 F.3d
598, 614-15 (4th Cir. 1999); Cullen, 338 F.3d at 702-03 (considering respective qualifications,
previous salaries and the amount of revenue created by the Plaintiff and comparator in assessing
the Defendant's affirmative defense under the EPA, as well as weighing the market forces
affecting the comparator's hiring).

Lastly, if the burden is met by the employer, "the plaintiff's claim must fail unless the
plaintiff can satisfactorily rebut the defendant's evidence."  Strag, 55 F.3d at 948.  Thus, "[w]hen
the defendant produces [] evidence supporting its affirmative defense, the burden of production
shifts back to the plaintiff who must come forward with specific facts showing that there is a
genuine issue for trial."  Brinkley, 180 F.3d at 614 (citation and internal quotations omitted).
Plaintiff may adduce evidence showing Defendant's explanation is false or pretextual, from
which the fact finder may infer a discriminatory motive by the employer.  Reeves v. Sanderson
Plumbing Products, Inc., 530 U.S. 133, 142-149 (2000).  Furthermore, "a motion for summary
judgment may not be defeated, however, by evidence that is merely colorable or is not
significantly probative."  Brinkley, 180 F.3d at 614 (citation and internal quotations omitted).
Plaintiff's prima facie case, Defendant's case in response, and Plaintiff's rebuttal case may all be
considered at the summary judgment stage.  Strag, 55 F.3d at 950-51; Brinkley, 180 F.3d at 614
(citations omitted).

2. *Analysis*

If the Court finds Plaintiff has shown a <u>prima facie</u> case under the Equal Pay Act, the Defendant may still prevail on summary judgment by meeting its burden to persuade and produce evidence that its decision to pay Collins less than comparable male employees was justified for non-discriminatory reasons.  Landmark has presented evidence that the differential is based on factors other than sex.

Particularly, Landmark has noted the qualifications of Wilson were drastically superior to Collins' credentials.  Moreover, Collins has never earned more than $65,000 per year, by her own admission, other than when employed by Landmark.  By contrast, Connors earned over $100,000 per year during his career before working for Landmark.  The disparities in qualifications and previous salaries serves as a proper basis for the pay differential under the Equal Pay Act.  Additionally, once Collins complained that her salary was deficient, Landmark conducted a market survey of others at different organizations who held similar positions.  The result of the survey showed that Collins was overpaid.  The survey's conclusion verify that Collins was appropriately compensated for her efforts at Landmark.  Also, the relative financial risks born by the permanent publishers were far greater than the risk ever shouldered by Collins as general manager.

Regarding Defendant's rebuttal evidence, the Court cannot state as a matter of law that Defendant will meet its burden of persuasion in showing non-discriminatory reason(s) for its pay decisions regarding Collins.  Accordingly, in light of Defendant's burden of persuasion in regards to its case in rebuttal, the Court concludes material issues of fact exist requiring the determination of a fact finder.

E.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED** as to

the Equal Pay Act claim.


VI.  TITLE VII CLAIM

Title VII provides "[i]t shall be an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a).

In a Title VII case, a plaintiff may either introduce direct or circumstantial evidence of

discriminatory intent, or establish its case under a burden shifting scheme similar to that which is

used by the Equal Pay Act.  Brinkley, 180 F.3d at 606-07 (citations omitted).

A.  Evidence of Discriminatory Intent

1.  *Legal Principles*

Regarding direct proof of discriminatory intent, "[w]hat is required is evidence of conduct

or statements that both reflect directly the alleged discriminatory attitude and that bear directly on

the contested employment decision."  Brinkley, 180 F.3d at 607 (citing Fuller v. Phipps, 67 F.3d

1137, 1142 (4th Cir. 1995)).  "If such evidence is lacking," the plaintiff may still proceed by

establishing a prima facie case, and adequately refuting any rebuttal evidence offered by

Defendant.  Brinkley, 180 F.3d at 607 (citation omitted).  "To survive summary judgment on the

basis of direct and indirect evidence, [plaintiff] must produce evidence that clearly indicates a

discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude

and the employment action."  Brinkley, 180 F.3d at 607 (citations omitted).  Isolated derogatory

comments will not suffice to establish either a discriminatory attitude or a nexus to the employment action.  Brinkley, 180 F.3d at 608 (citations omitted).

### 2. *Analysis*

By her own admission, Collins states she believes Eisenbeiss did not intentionally or maliciously discriminate against her because of her gender.  Her declaration, apparently offered to refute her earlier sworn testimony, confirms her statement by tending to show that Eisenbeiss, at most, discriminates subconsciously against women.  To allow the declaration to stand for more is to allow Collins to create a sham issue of fact by contradicting herself.  Aside from her admission regarding Eisenbeiss, Collins merely asserts, without additional facts, that another female may have been treated differently than male employees.  To the contrary, other Landmark employees confirm that Eisenbeiss did not treat employees differently according to their gender.  Accordingly, there is insufficient direct evidence of intentional gender discrimination in this case, and no reason to conclude that any gender bias affected Eisenbeiss' employment decisions regarding Collins.  As such, the Court finds Collins cannot establish her Title VII claim by showing evidence of statements or conduct clearly indicating a gender bias and bearing on a discriminatory employment decision against Collins.

### B. Prima Facie Case and Burden Shifting Scheme

### 1. *Prima Facie Case*

Where direct evidence of intentional gender discrimination is not shown, a plaintiff asserting a violation of Title VII "must establish a prima facie case of discrimination."  Brinkley-Obu, 36 F.3d at 343.  "Under Title VII, a prima facie case of sex discrimination requires showing a connection between sex and the adverse employment decision."  Brinkley-Obu, 36 F.3d at 343

(citation omitted).  "The plaintiff may establish a <u>prima facie</u> case by demonstrating that she is female, i.e., a member of a protected class, and that the job she occupied was similar to higher paying jobs occupied by males."  <u>Brinkley-Obu</u>, 36 F.3d at 343 (citation omitted).  In a Title VII claim, as compared to an action under the Equal Pay Act, "there is a relaxed standard of similarity between male and female-occupied jobs."  <u>Brinkley-Obu</u>, 36 F.3d at 343 (citations and internal quotations omitted).  However, in a Title VII action, "a plaintiff has the ultimate burden of proving an intent to discriminate on the basis of sex."  <u>Brinkley-Obu</u>, 36 F.3d at 343.[11]

2.  *Burden of Production Shift to Defendant*

In Title VII cases, in distinction to Equal Pay Act claims, only the burden of production shifts to the Defendant after a <u>prima facie</u> case is presented by the Plaintiff.  <u>Brinkley-Obu</u>, 36 F.3d at 344 (citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 n.8 (1981) ("the allocation of burdens and the creation of a presumption by the establishment of a <u>prima facie</u> case [in a Title VII case] is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.")); <u>Burdine</u>, 450 U.S. at 253 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.").  Defendant may attack Plaintiff's <u>prima facie</u> case by asserting any of the affirmative defenses detailed in the Equal Pay Act, 29 U.S.C. § 206(d)(1)[12],

---

[11] As noted in Section VI(A) of this Opinion and Order, an insufficient showing of similarity between male and female jobs should not preclude a Title VII action in cases where a discriminatory intent is shown.  <u>County of Washington v. Gunther</u>, 452 U.S. 161, 178-79 (1981) ("Congress surely did not intend the Bennett Amendment to insulate such blatantly discriminatory practices from judicial redress under Title VII [for failure to show a sufficient male comparator].").

[12] These exceptions include showing the pay disparity resulted from: (1) a seniority system, (2) a merit system, (3) a system that measures earnings by quantity or quality of

as well as by showing the pay disparity resulted from the application of a "professionally developed ability test" or by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's [disparate treatment]."  42 U.S.C. § 2000e-2(h); <u>Burdine</u>, 450 U.S. at 253.

"Once the defendant offers a non-discriminatory justification for the wage differential, the burden of persuasion remains on the plaintiff to demonstrate that the proffered explanation is pretextual and that the defendant was actually motivated by discriminatory intent." <u>Brinkley-Obu</u>, 36 F.3d at 344 (citing <u>Burdine</u>, 450 U.S. at 253).  The plaintiff may meet its burden of showing discriminatory intent "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence." <u>Brinkley-Obu</u>, 36 F.3d at 344 (citation omitted); <u>Reeves</u>, 530 U.S. at 148, 142-149 ("[A] plaintiff's <u>prima facie</u> case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  In order to prove an intent to discriminate, the Plaintiff must do more than merely show unequal pay periods. <u>Gustin v. West Virginia Univ.</u>, 63 Fed. Appx. 695, 699 (4th Cir. 2003) (unpublished).

### 3. *Similarity Between Jobs*

Under Title VII, the Plaintiff does not have to show the same level of similarity between her job and those of male comparators as under the Equal Pay Act. <u>Brinkley-Obu</u>, 36 F.3d at 343 (citation omitted).  Rather, the Plaintiff must show "a relaxed standard of similarity between male and female-occupied jobs." <u>Brinkley-Obu</u>, 36 F.3d at 343 (citations and internal quotations omitted).  This equivalence is established by showing "that the positions require the same type of

production, or (4) a differential based on any factor other than sex.  29 U.S.C. § 206(d)(1).

tasks." <u>Rapson</u>, 2004 U.S. Dist. LEXIS 12579, at *14 (internal quotation and citation omitted). Absent otherwise proving discriminatory intent, Title VII does not redress claims that one job should be paid more than another dissimilar job.  <u>Wheatley</u>, 390 F.3d at 335 n.2 ("The trial judge noted that 'perhaps one could make a policy decision that the head of Emergency Services should be paid the same as the head of Public Works.'  But to say that Title VII requires such an outcome is a different matter altogether.").

4. <em>Analysis</em>

Regarding Collins' <u>prima facie</u> case under the Title VII burden shifting scheme, Collins clearly is a member of a protected class.  Additionally, while her burden in comparing her position as general manager to the permanent publisher jobs is relaxed, the same evidence would still guide the Court's analysis.  For this reasons stated in Section V(C) of this Opinion and Order, which applied a more exacting standard, the Court regards the alleged facts as properly making out a <u>prima facie</u> case under Title VII.

As Collins has presented a <u>prima facie</u> case under Title VII, the burden of production shifts to Landmark to establish a non-discriminatory reason for the pay disparity.  As stated in Section V(D) of this Opinion and Order, Defendant has showed several non-discriminatory reasons justifying its pay decisions regarding Collins, including disparities between Collins' credentials, previous salaries and responsibility and those of her comparators.  Also, Defendant conducted a market survey, which showed Collins was overpaid.

Most importantly, in a Title VII case, the Plaintiff always bears the burden of persuasion regarding intentional discrimination.  Presently, there is no evidence from which to conclude that Landmark, through Eisenbeiss, intentionally discriminated against Collins on the basis of sex.  In

fact, Collins admits she does not believe Eisenbeiss acted with premeditation, intent or malice in making his employment decisions regarding her salary.[13]

## C.  Conclusion

Because Collins has adduced no evidence showing intentional discrimination, and rather has conceded that Landmark, through Eisenbeiss, did not act with a discriminatory intention, Collins' claim under Title VII must fail.  Accordingly, Defendant's Motion for Summary Judgment as to the Title VII claim is **GRANTED**.

## VII.  CONCLUSION

---

[13] Defendant cites Brewster, 788 F.2d at 992-93, for the proposition that Plaintiff's admission to not believing her supervisor intentionally discriminated against her is fatal to her case.  However, Brewster deals with the situation where the defendant believed it was complying with the law as evidence that defendant did not intend to discriminate; accordingly, Defendant's reliance on Brewster is misplaced.  788 F.2d at 992-93.  Despite the misapplication of Brewster, the force of Defendant's argument is not diminished.

For the reasons stated herein, Defendant's Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part.  Additionally, the Court **GRANTS** Plaintiff's Motions to Amend the Complaint and For an Extension of Time to File a Pleading.

The Clerk is **DIRECTED** to mail a copy of this Opinion and Order to counsel of record.

It is so **ORDERED**.

_____/s/_____
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
August 3, 2007